# HUSBAND AND WIFE.

JAQUES *v.* THE TRUSTEES OF THE METHODIST EPISCO-
PAL CHURCH.   On appeal, 17 J. R. 548–598.

In Ch. 1 J. C. R. 450, 2 id. 543 ; 3 id. 77.   In the Court of Chancery, the suit
was, *Methodist Episcopal Church and others* v. *J. D. Jaques, R. Jaques,
and H. Cruger.*

*Marriage Settlement ; Delivery of Deed containing it to
Trustee ; Accountability of Husband for the Separate
Estate of the Wife, received by Him during Coverture ;
Expense of maintaining the Wife and Family during
Coverture ; Agreement of Wife that it shall be borne
out of her Separate Property.*

THE bill in this case, was filed by the trustees of the
Methodist Episcopal Church, as legatees and devisees of one-
third of the estate of Mary Jaques, deceased, late the wife of
the defendant, J. D. Jaques.  The bill stated that Mary
Jaques, at the time of her intermarriage with the defendant,
J. D. Jaques, was possessed of a large real and personal es-
tate, &c. ; that in contemplation of her marriage with him,
a deed of marriage settlement dated 25th of September,
1805, was made and entered into between herself, of the first
part, J. D. Jaques of the second part, and H. Cruger of the
third part, by which the said Mary conveyed all her estate
real and personal, to the defendant, Cruger, to the use of the
said Mary, until the said marriage should take place ; and
from and after the marriage, to the use of such persons and
for such estates as she, *with the concurrence of her intended
husband, should, by deed attested by two witnesses, or by
her last will and testament, limit and appoint ; and until
such appointment,* to the use of H. Cruger and his heirs du-
ring the life of the said Mary, to enable her to take the pro-
fits thereof, free from the control of her husband, and at *her
absolute disposal ;* and that immediately after the execution
of the deed, the marriage took place between the parties.
The bill then charged that the husband had possessed him-

self of her personal estate, and of the rents and profits of her real estate, &c. It also set forth that the wife, intending to execute the power reserved to her by the deed of settlement, did, with the concurrence of her husband, by deed dated the 12th of September, convey all her real estates to the defendant, Robert Jaques, in fee, upon *trust ;* that after her decease he should sell the same, and should dispose of the proceeds after paying expenses, as follows : one-third to the plaintiffs, trustees of the Methodist Episcopal church ; one-third to the plaintiffs, wife and children of T. B., in equal shares ; and one-third to the husband. That after the execution of the deed, she, on the 25th of Sept. 1812, made her last will and testament, by which she gave several specific legacies to the plaintiffs, &c.; and all the residue of her estate she gave one-third to the plaintiffs, the trustees of the Methodist Episcopal church ; one-third to the plaintiffs, children of T. B., &c., and one-third to her husband, and appointed P. H., T. B., and John D. Jaques, her husband, executors. The bill prayed an account of discovery of what moneys or securities belonging to Mary Jaques, at the time of her marriage, had come to the hands of the defendant J. D. Jaques, and how he had disposed of the same; also of the rents and profits of the real estate received by him; and that the title deeds might be brought into court; that a receiver be appointed, and for general relief, &c.

The defendants admitted, in their answers, and set forth the real and personal property of Mary Jaques, at the time of her marriage, &c. . That the deed of settlement, of the 25th of September, 1805, was signed and sealed, but that it was never *delivered,* and therefore they denied its validity.

The case was brought to a hearing upon pleadings and proofs, and it being conceded that there must be a reference to a master to state an account between the parties; the Chancellor proceeded to settle the principles upon which the account was to be taken.

He said, in delivering his opinion, (1 J. C. R. 456, *et seq.*)

1. " I am of opinion, in the first place, that the marriage settlement of the 25th of September, 1805, is to be considered as valid and binding. It was executed by Mrs. Jaques, prior to the marriage, with the usual solemnities, and laid

upon the table, in the presence of all the parties to it. It was executed in reference to the marriage, which took place immediately thereafter; and while the deed so remained upon the table. The deed, under these circumstances, is to be considered as fully consummated. The husband, during the coverture, recognized the deed," &c.

2. "The deed of settlement being valid, and to be supported in this court, the defendant J. D. Jaques, is to account for the *whole personal estate* of his wife, which may have come to his possession. But, considering the confidential nature of the marriage connection, and the agency of the estate, which usually and almost necessarily results from it, it would be too rigorous to charge the husband with *interest* on the moneys which may from time to time, have been received."

3. "The defendant J. D. Jaques, is to account for all the rents and profits, which he may have received of her real estate, including the leasehold estate and the freehold purchased in by him under the operation of *Heyl's* mortgage. Those lands were purchased by him with the moneys of his wife, and the purchases consequently accrued to her benefit."

4. "*No allowances* are to be made to the defendant, J. D. Jaques, for *the maintenance of his wife and family, during the coverture*, that being a duty chargeable upon him as husband; and in no respect chargeable upon the *wife's separate estate*. I have not, therefore, paid any attention to the parol proof of the confessions of the wife during the coverture, as to any agreement that the family expenses were to be borne by her separate estate."

5. "It would be proper that the real estate left by Mrs. Jaques, including the lands so held in trust for her, should be sold, and the proceeds brought into court, to be distributed according to the directions in the deed and will of Mrs. Jaques." A decretal order was entered accordingly.

---

Upon the coming in of the master's report, the defendant took 14 exceptions, which are separately considered and disposed of by the Chancellor. So far as the principles of the decretal order made at the time of the reference are concerned, the opinion is in the main a mere application of them to the matters of the exceptions. 3 J. C. R. 77–120.

But upon the point, "how far the wife's estate was to be charged with the *family expenses*, by virtue of her general agreement to that effect; Chancellor Kent goes *into a most* elaborate review of all the English cases on the subject of the wife's acts and agreements in relation to the management and disposition of her separate estate. To that examination, we refer the reader who would trace the history of the subject, through the mazes of successive decisions; sometimes contradictory, often obscure, and seldom entirely satisfactory. It is no wonder, that Lord Eldon in *Parker* v. *White*, 11 Ves. Jun. 209, should say, that "it was extremely important that the power of the wife over her separate estate should be, once for all, well decided, and *that his mind was in great distraction on the subject.*" After the review of the cases, Chancellor Kent thus concludes. "I apprehend we may conclude (though I certainly do it with unfeigned diffidence, considering how great talents and learning, by a succession of distinguished men, have been exhausted on the subject,) that the English decisions are so floating and contradictory, as to leave us the liberty of adopting the true principle of these settlements. Instead of maintaining that she has an absolute power of disposition, unless specially restrained by the instrument, the converse of the proposition would be more correct, that she has no power but what is *specially given,* and to be exercised only in the mode prescribed, if any such there be. Her incapacity is general, and the exception is to be taken strictly, and to be shown in every case, because it is against the general policy and immemorial doctrine of law." "There being, in the present case, a clear mode of *appointment* prescribed, it would be unjust and contrary to the settlement to set up any parol confession or agreement of the wife, as a title to her property. The exception is accordingly overruled." A decree having been entered in conformity with these decisions of the Chancellor, the defendants, J. D. Jaques, and Robert Jaques, appealed to the Court Errors. The respondents, also, filed a cross appeal.

In the Court of Errors, a preliminary question was raised, argued and decided, with respect to the review which the appellants proposed to take, of the several interlocutory orders and decrees, made in the progress of the cause, though made more than 15 days before the appeal was filed.

The court held, Spencer, Ch. J., delivering the opinion, that "an appeal from a final decree, opens for consideration all prior or *interlocutory* orders or decrees, any way connected with the *merits of the final decree*." The rest of the judges concurred, and by the unanimous opinion of the court, the appellant was allowed to proceed accordingly. After hearing on the merits :

Spencer, Ch. J., delivered an opinion in favor of *reversal*. He however held, upon the same general grounds of the Chancellor, that the deed of marriage settlement was entirely free from the objection taken to its validity on the ground of non-delivery. He says : " the possession of the deed by Mrs. Jaques, is not inconsistent with a delivery to Cruger ; for the possession of the deed by the *cestui que trust*, was in a legal view, the possession of the trustee, and after his repeated and solemn acts of recognition, the husband can not be heard to say the deed of settlement was not delivered." As to the power of the wife over her separate estate, he says :

" The question is whether Mrs. Jaques, with respect to her estate, is not to be regarded in a court of equity as a *feme sole*, and may not *dispose* of it as she pleases, without regard to her trustee ; there being nothing in the deed of settlement requiring the consent or concurrence of her trustee, nor any negation of an unlimited power of disposition of the estate by her."

" I have examined this case with the unfeigned respect which I always feel for the learned Chancellor, who has denied the right of Mrs. Jaques to dispose of her estate, without the consent or concurrence of her trustee, and I am compelled to dissent from his opinion and conclusions. From the year 1740 to 1793, (with the single exception of the opinion of Lord Bathurst in *Hulme* v. *Tenant*, and in which case, a re-hearing was granted by Lord Thurlow, and the opinion reversed,) there is an unbroken current of decisions that a *feme covert*, with respect to her separate estate, is to be regarded, in a court of equity, as a *feme sole*, and may dispose of it without the consent or concurrence of her trustee, unless she is specially restrained by the deed or instrument under which she acquires her separate estate. There are nearly twenty cases decided by Lord Hardwicke and

Lord Thurlow, containing the principle I have stated, and which I shall not weary the patience of the court by citing.

" The mistake into which I think the Chancellor has fallen, consists in considering Mrs. Jaques, *restrained* from disposing of her estate in any other way than that mentioned in the deed of settlement." " It seems to me that the power reserved to Mrs. Jaques by the deed, has been misconceived: I understand it that during her life, her estate is to be at her absolute disposal, with a further power to grant and devise it by her last will and testament ; but if the power of disposition, was specifically pointed out, it would not preclude the adoption of any other mode of disposition unless there were negative words restraining the exercise of the power, except in the very mode pointed out.

"It necessarily results from the power which I suppose Mrs. Jaques to have had over her property, that she might give it away, without any formal act, in the same manner as *if she had been sole ; and her* agreement, that the family expenses were to be borne out of her estate, especially when executed by her, was a valid act. She was well situated as regards property, while her husband was in moderate circumstances. She chose, after her marriage, to maintain her former equipage, and her husband acquiesced in her wishes. It would be extremely hard and unjust, to throw upon him the charge of her establishment, when it is clear that she meant to defray the expenses of it herself. My opinion, accordingly is, that the agreement is valid, and that the husband is not only not to be *charged* with any sums of money expended for the maintenance of the family, but that he is to be *allowed* for all advances for that object, and also for moneys advanced for necessary reparations to her estate."

"The Chief Justice," says the reporter, "then examined the other points in the case ; but as no legal principle was involved in the discussion of them, it is unnecessary to state the remainder of his observations."

With the foregoing opinion of Chief Justice Spencer, Platt, J., concurred in an opinion maintaining the same grounds, and a majority of the court concurring, (two senators only dissenting,) the decree was on those grounds *reversed ;* and the court decreed that the decretal order of

Chancellor Kent, of the 27th of June, 1815, (1 J. C. R. 450,) be *so far reversed*, as that the husband should not be charged with the expenses of the family establishment, and should be allowed his advances therefor; and for reparations, &c.; and that the questions of *costs* in the Court of Chancery, and all further directions as to the final decree in the cause, be referred back to the Court of Chancery.

This case makes its appearance once more, in Hopkins' Rep. 453.

" This very litigated cause," as the reporter, Mr. Hopkins, justly styles it, came up again before Chancellor Sandford, upon 14 exceptions to the master's report upon the new adjustment of the accounts ; " some of which," says the reporter, " were to matters of detail and of account ; but others seemed to involve so much of principle, that it has been thought not unfit to continue, perhaps to conclude, the judicial history of this cause, by the decision of the exceptions."

The marginal note of the reporter seems fully sufficient to show the application made by Chancellor Sandford, of the principles of the decree of the Court of Errors ; which we give accordingly.

1. The answer having stated in substance that the moneys received of R., were paid over by the defendant to his wife, but did not specify the amount, but which was proved by R. *Held*, that upon taking the account before a master, this allegation of the answer must be received as sufficient discharge of defendant, there being no opposite testimony. But in relation to other items, where the statements of the defendant's answer were *vague and general*, he was not allowed to discharge himself by such answer ; the *receipt* of the money appearing by other testimony.

2. In this case, where the proceedings had been various and perplexed, and the accounts were intricate, though the complainants filed some exceptions, which were in effect repetitions of some others, yet as they tended to present the subject in a different point of view, the court would not disallow them as *repetitions* or as *argumentative ;* and in the peculiar circumstances of this case, the court would not disallow an exception which was long and systematic, and so

framed as to present, in effect, the substance of such a report as the complainants contended ought to have been made.

3. By the decision in error, the defendant J. D. J., was to be allowed for the sums paid for the support of his wife for several years: the Chancellor held that though 'the burden of proof rests on the defendant, yet it must be reasonable proof, according to the circumstances of the case. Actual vouchers for such expenses are not to be required, much may be left to reasonable presumption ; and general evidence of what must be the expenses of a family in like circumstances, may form to a great extent, the criterion."

The cause was re-committed to a master to state an account according to the decision on the exceptions, and the explanations with which they were, and the decree of the Court of Errors as the basis.